IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. 09-497-1 |
| | : | |
| KWAME FLUELLEN | : | |

**MEMORANDUM OPINION**

Smith, J.                                                                                                                February 2, 2022

Currently before the court is a motion for early termination of supervised release filed by a movant who pleaded guilty to participating in an extensive drug distribution conspiracy and received a sentence which included a mandatory five-year term of supervised release. The movant, who lives in California, seeks the early termination of his supervised release in large part so that he can have greater freedom to visit and provide for his son, who lives in North Philadelphia. He also seeks to advance his career as a CDL A-class diver and start a trucking business.

At the time he filed the motion, the movant had served approximately 14 months of his five-year period of supervised release. Despite this short time on supervised release, the movant's probation officer supports the court ending the movant's term of supervised release as he has complied with all conditions imposed upon him and has been an exemplary supervisee.

The government has opposed the motion primarily because it believes that the movant waived his ability to file the instant motion as part of his plea agreement. It also argues that even if the court were to find that the waiver did not apply here, there are no changed circumstances in this case that would justify the court granting the motion.

As discussed in more detail below, the court does not find that the waiver that was part of the movant's written plea agreement bars a motion for early termination of supervised release.

Nonetheless, the court does not find that terminating supervised release at this early stage is warranted. Therefore, the court will deny the motion.

## I. PROCEDURAL HISTORY

On July 22, 2009, a grand jury returned a two-count indictment against the defendant, Kwame Fluellen ("Fluellen"), and four co-defendants, charging them with (1) one count of conspiracy to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. § 846 and (2) one count of possession with intent to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1). *See* Doc. No. 35. On January 5, 2011, Fluellen pleaded guilty to both counts of the indictment in a hearing before the Honorable Legrome D. Davis, now retired. *See* Doc. No. 225.

During the guilty plea hearing, Fluellen admitted to the following conduct as the factual basis supporting his charges:

> This was a long-term investigation -- actually, two long-term investigations that were brought together into one case, one by the FBI and Allentown and Easton Police Department, the other by State agencies for the Bureau of Narcotics Investigations in Pennsylvania.
>
> That investigation focused on Kwame Fluellen, initially Kwame Fluellen and his brother Che Fluellen, and in the course of that investigation the FBI and Easton Police developed seven different confidential sources who would now be available as cooperating witnesses. And those -- all those sources would be test -- would testify to actions by either Kwame Fluellen, Che Fluellen or both.
>
> As set forth in greater detail in Pages 4 to 11 in the plea memo, there would be more precise evidence that would be presented by them, but to summarize it, that evidence would show that from some time in approximately October of 2007 to February of 2009, there were agreements among this Defendant and his co-defendants and others to distribute methamphetamine in the Lehigh Valley area of the Eastern District of Pennsylvania. Some of that evidence involved the following.
>
> The first confidential source, there was an offer from Kwame Fluellen to -- to distribute methamphetamine to that source. That source at the time was not involved in methamphetamine but in other drugs, so declined the offer. As to the second source, CS-2, CS-2 had had as part of CS-2's cooperation some recorded

telephone conversations with Che Fluellen. And one of those recorded conversations, aside from the admission about a half a pound of methamphetamine had been distributed, in that same conversation there was a discussion that Kwame Fluellen had an entire pound of methamphetamine at the time.

There were other conversations, that conversation was December 20 of 2007. There was another recorded call on January 15th of 2008 in which Kwame Fluellen instructed CS-2 to send payments for drugs to him via wire, specifically Western Union to Mr. Fluellen, who was at the time in Compton, California.

There were other -- again, other sources. Confidential Sources 3 and 4 and 5 discussed their knowledge based on their own drug-trafficking activities of Kwame Fluellen and Che Fluellen and some of the other co-defendants, and their ability to sell methamphetamine and the drug sales of methamphetamine to its informants and to others. The Confidential Source 4 indicated that he had purchased amounts from one half ounces to four ounces approximately semi-monthly, for which CS-4 paid 1400 to $1500.

And then there was a Confidential Source Number 7 who had made a series of recorded telephone calls and undercover purchases of methamphetamine. There were a dozen of those purchases made and all those purchases were made from the co-defendant Che Fluellen in this case.

There was an undercover operation done by the Bureau of Narcotics Investigations in Pennsylvania and that culminated on October 30th, 2008. That involved yet a separate source, somebody who has been referred to by the initials KG in the indictment. I'll continue to refer to that person as KG here. And that source had been -- had been found with methamphetamine at the source's property, was being investigated by BNI. That source then gave -- gave BNI agents the sources of suppliers, indicated that the source of suppliers specifically were two people KG had known as Cuz, who was Malik Frazier, it was a common nickname for Malik Frazier, and King, who was a nickname for the Defendant, Kwame Fluellen. KG had dealt face-to-face on a number of occasions with Malik Frazier, had only talked on the phone with Kwame Fluellen, but was familiar with -- as a result was familiar with Kwame Fluellen's voice and would be able to identify Kwame Fluellen's voice.

This culminated on October 30th, 2008, with an agreed purchase of five pounds of methamphetamine. There was an agreement to distribute those drugs to KG, who was accompanied by an undercover BNI agent in the area of Hellertown, which is in Northampton County, Pennsylvania. There were conversations during the trip to Hellertown between KG and Kwame Fluellen, and Kwame Fluellen essentially arrived with Che Fluellen in an SUV and with Rashad Toombs. Rashad Toombs was the person who was sent to make the delivery, to pick up the money from KG and the undercover agent. When Rashad Toombs entered the undercover car, he had the methamphetamine with him, but he did -- the agents did not have

3

> money to pay for the methamphetamine. The result was that Rashad Toombs was arrested a short distance from that area where the transaction were to occur. Kwame Fluellen and Che Fluellen engaged in -- left the scene in the SUV. Mr. Kwame Fluellen was caught nearby after a brief chase in which the SUV hit some other vehicles and then eventually flipped over. Che Fluellen actually escaped the area, fled on foot and escaped the area. He was caught later on in the Atlanta, Georgia area, he was extradited from Georgia to Pennsylvania for state prosecution.
>
> The result was that there was 2,146 grams of methamphetamine that was seized at that time pursuant to that -- to that transaction or proposed transaction.
>
> At the time of his arrest on October 30th, 2008, Kwame Fluellen possessed $4,000 in cash, consisting of about 40 -- of precisely 40 $100 bills. Also in plain view inside the crashed SUV there was -- there were seven cellular telephones as well.
>
> At the time, Rashad Toombs had -- when he was arrested, he initially waived his Miranda rights, he implicated himself. He also implicated Kwame Fluellen in the first statement. Rashad Toombs later on gave a recanted or second statement in which he implicated only himself and attempted to exculpate Kwame Fluellen in that situation.
>
> After the incarceration of Kwame Fluellen and Rashad Toombs in Carbon County Prison, there were a number of recorded telephone calls. The Carbon County Prison of course has the same visual and auditory warnings about calls being recorded that the Federal prisons have, but despite that there were a number of calls -- and, again, they are in more detail from Pages 9 and 10, they are given, but I'll summarize them to say that there were a number of calls in which Kwame Fluellen had spoken to other people involved in this or associated with this conspiracy and in which he indicated that there were drugs that were to be moved. The drugs were sometimes referred to as luggage, which was -- the witnesses would testify was a common code word used by them for drugs or methamphetamine.
>
> And essentially all of these again -- while it's difficult to ascertain the precise amount of methamphetamine that was distributed throughout the entire course of the conspiracy, the amount that's readily provable that we can attribute to Kwame Fluellen is at least five kilograms of methamphetamine, but no more than 15, which was an amount that was foreseeable to him, and an amount that was jointly undertaken by him and his co-conspirators.

Change of Plea Hr'g at 19–24, 25, Doc. No. 225.[1]

---

[1] This transcript is also available at Doc. No. 247-2.

Fluellen admitted his guilt to this misconduct pursuant to a written plea agreement entered into by the parties. *See* Doc. No. 133. The plea agreement included an appeal and collateral attack waiver which provided that, *inter alia*, Fluellen

> voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law.

Guilty Plea Agreement at 4, Doc. No. 133.

On November 17, 2011, Judge Davis sentenced Fluellen to an aggregate sentence of 180 months' imprisonment, $1,500 in restitution, a $200 special assessment, and five years of supervised release.[2] *See* J. at 2–6, Doc. Nos. 208, 227. Although Fluellen did not appeal from this sentence, he filed a *pro se* motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255, which the clerk of court docketed on June 23, 2014. *See* Doc. No. 220. The government opposed the motion and argued that the court should dismiss the motion because (1) Fluellen untimely filed it, (2) Fluellen waived his right to file the motion pursuant to the waiver in the parties' plea agreement, (3) Fluellen waived the issue raised in the motion because he did not appeal the issue, and (4) the motion was substantively meritless. *See* Gov't's Resp. in Opp'n to Def. Kwame Fluellen's Pet. for Post-Conviction Relief Under 28 U.S.C. § 2255 at 3–13, Doc. No. 228. On September 11, 2014, Judge Davis entered an order dismissing Fluellen's section 2255 motion, concluding that the motion was untimely and, even if it was timely, Fluellen had waived his right to file such a motion via the collateral attack waiver included in the plea agreement. *See* Sept. 11, 2014 Order at 5–12, Doc. No. 230.

---

[2] As discussed later in this opinion, the pre-sentence investigation report reflected that the guideline range was 210 to 262 months. Thus, Judge Davis sentenced Fluellen below the applicable guideline range.

On June 21, 2015, Judge Davis entered an order reducing Fluellen's term of imprisonment to 168 months, effective November 1, 2015, pursuant to 18 U.S.C. § 3582(c)(2) and Amendment 782 to the Sentencing Guidelines. *See* Doc. No. 234. Chief Judge Sanchez reassigned this matter from Judge Davis's calendar to the undersigned's calendar on April 30, 2018. *See* Doc. No. 240.

Fluellen then filed the instant motion for early termination of supervised release. *See* Doc. No. 245. The court ordered the government to file a response to the motion, *see* Doc. No. 246, and the government timely filed a response in opposition to the motion. *See* Doc. No. 247. The court held an evidentiary hearing on the motion via video conference, during which Fluellen, his probation officer, Kameron Smith, and counsel for the government were present. The motion is now ripe for disposition.

## II.  DISCUSSION

### A.  Law Applicable to Motions for Early Termination of Supervised Release

With respect to the motion for early termination of supervised release, the court

> may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)—
>
> (1) terminate a term of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the modification of probation, if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice[.]

18 U.S.C. § 3583(e)(1). "The expansive phrases 'conduct of the defendant' and 'interest of justice' make clear that a district court enjoys discretion to consider a wide range of circumstances when determining whether to grant early termination." *United States v. Melvin*, 978 F.3d 49, 52 (3d Cir. 2020) (quoting *United States v. Emmett*, 749 F.3d 817, 819 (9th Cir. 2014)). As the individual seeking early termination of supervised release, Fluellen has the burden to show that early termination is warranted. *See United States v. Mabry*, 528 F. Supp. 3d 349, 356 (E.D. Pa. 2021)

6

("The burden is on the defendant to show that early termination is warranted under the factors set out in the statute." (citing *United States v. McDowell*, 888 F.2d 285, 291 (3d Cir. 1989))).

### B.    Whether the Motion is Timely Filed

The court must first determine whether the instant motion is timely. *See* 18 U.S.C. § 3583(e)(1) (indicating that court may only terminate period of supervised release if defendant has served one year of supervised release). The government acknowledges that the motion is timely insofar as Fluellen served approximately 18 months of his five-year term of supervised release at the time the government filed its response. *See* Gov't's Opp'n to Def. Kwame Fluellen's Mot. for Early Termination of Supervised Release ("Gov't's Opp'n") at 11, Doc. No. 247. Accordingly, the court finds that Fluellen has served the necessary one-year period of supervised release prior to filing this motion.

### C.    Whether the Waiver Language in Fluellen's Plea Agreement Bars This Motion

After determining that the instant motion is timely, the court next addresses an argument raised in the government's response in opposition to the motion. The government contends that a waiver in Fluellen's plea agreement bars him from seeking early termination of his supervised release. *See id.* at 4–11. The government asserts that the Third Circuit Court of Appeals has determined that petitions for early termination of supervised release qualify as challenges to a defendant's sentence that can be waived via language in a plea agreement. *See id.* at 4-6 (citing *United States v. Damon*, 933 F.3d 269 (3d Cir. 2019)). The government also points out that (1) Fluellen voluntarily entered into the waiver, (2) no exception to the waiver applies, and (3) this case does not present a miscarriage of justice to warrant not enforcing the waiver. *See id.* at 6–11.

Although Fluellen has not responded to this particular argument in a written submission, the court concludes that he has not waived his ability to seek the early termination of his supervised

release. In this regard, the Third Circuit's decision in *Damon* is inapplicable here because the waiver at issue in that case is different than the waiver here and the Third Circuit's decision turned on the specific language in the waiver in that case.

In *Damon*, the district court had denied a motion for early termination of supervised release based on a waiver in the parties' plea agreement. *See* 933 F.3d at 270. The defendant appealed from the denial, and the Third Circuit, in resolving the appeal, had to consider whether the following language in the plea agreement precluded the defendant from seeking the early termination of his supervised release:

> Ronald Damon knows that he has and, except as noted below in this paragraph, voluntarily waives, the right to file any appeal, any collateral attack, or any other writ or motion, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255, which challenges the sentence imposed by the sentencing court if that sentence falls within or below the Guidelines range that results from the agreed total Guidelines offense level of 33.

*Id.* at 271 (citation omitted).

The Third Circuit initially noted that the entire dispute on appeal pertained to whether the motion for early termination of supervised release fell within the scope of this waiver. *See id.* at 272. The court, using principles of contract interpretation to analyze the plea agreement, determined that the term "sentence imposed" also "encompassed the duration of his supervised release." *Id.* at 274.

The court pointed out that the waiver barred "challenges" to the term of his supervised release. *See id.* The court noted that "[i]n the agreement, Damon waived the right to file any motion or appeal that "challenges the sentence imposed." *Id.* Since supervised release was part of the sentence that the defendant received, his motion to terminate the term of his supervised release was a "challenge" to his sentence because he was "questioning his original sentence by seeking to

shorten the term of his supervised release." *Id.* Thus, "[b]y its very nature, [the motion for early termination] is a challenge to the sentence imposed." *Id.*

It appears that judges in this district, most of which have applied *Damon*, have reached conflicting decisions on whether the waiver at issue here bars motions for early termination of supervised release. *Compare United States v. Wadlington*, Crim. A. No. 12-457-2, 2022 WL 206173, at *1 (E.D. Pa. Jan. 24, 2022) (addressing identical waiver in plea agreement and concluding that waiver barred motion seeking early termination of supervised release), *and United States v. Clark*, Crim. A. Nos. 06-205-7, 06-207-5, 2021 WL 3737195, at *1, 3–5 (E.D. Pa. Aug. 24, 2021) (same), *and United States v. Ball*, Crim. A. No. 05-56-10, 2021 WL 51461, at *2–3 (E.D. Pa. Jan. 6, 2021) (same), *with United States v. Crews*, Crim. No. 10-663-5, 2020 WL 6581430, at *2 (E.D. Pa. Nov. 10, 2020) (concluding that waiver did not bar motion for early termination of supervised release). This court has thoroughly reviewed these decisions and finds that the waiver does not bar the type of motion filed here.

As the Third Circuit explained in *Damon*, this court must apply "contract law standards" in interpreting the waiver provision in Fluellen's plea agreement. 933 F.3d at 272 (quoting *United States v. Corso*, 549 F.3d 921, 927 (3d Cir. 2008)). "Thus, we begin our analysis as we would with any contract, by examining first the text of the contract." *Id.* (citation, internal quotation marks, and alteration omitted).

The text of Fluellen's waiver provision is different than the waiver in *Damon*. In *Damon*, the waiver barred the defendant from filing "any appeal, any collateral attack, **or any other writ or motion** . . . **which challenges the sentence imposed by the sentencing court**." *Id.* at 271 (emphasis added). Here, Fluellen's "plea agreement is narrower and only bars appeals and collateral attacks," *Mabry*, 528 F. Supp. 3d at 354, of his "conviction, sentence, or any other matter

9

relating to this prosecution." Guilty Plea Agreement at ¶ 8. This distinction is important because the Third Circuit focused significant attention on the "challenges the sentence imposed" language in the plea agreement in *Damon*. *See* 933 F.3d at 274–75. The Third Circuit defined the word "challenges," and determined that Damon's motion was a "challenge to the sentence imposed." *Id.* at 274.

Fluellen's waiver does not contain the "challenges" language which was present in *Damon*. Instead, it is limited to barring Fluellen from filing appeals and collateral attacks. *See* Guilty Plea Agreement at ¶ 8. As such, the only "question [is] whether the motion is an appeal, a collateral attack, or neither. If it is an appeal or collateral attack, the motion to reduce a term of supervised release would be barred. If the motion is neither an appeal nor a collateral attack, it would not be barred." *Mabry*, 528 F. Supp. 3d at 354.

Fluellen's motion is not an appeal or a collateral attack on his sentence.[3] *See id.* at 354–55 ("Given the ordinary meaning of 'appeal' and 'collateral attack,' the waiver in this case does not

---

[3] The court recognizes that there are two other decisions in this district where the court thoroughly analyzed the waiver at issue here and twice determined that it barred motions seeking early termination of supervised release. *See Clark*, 2021 WL 3737195, at *3–4; *Ball*, 2021 WL 51461, at *2–3. In reaching this decision, the court relied in large part on the Third Circuit's decision in *United States v. Oyerinde*, 784 F. App'x 111 (3d Cir. 2019). *See Clark*, 2021 WL 3737195, at *4 ("Consistent with our Court of Appeals' decision in *Oyerinde*, we find the identical appellate waiver provision in Mr. Clark's plea agreement bars his petition."); *Ball*, 2021 WL 51461, at *3 ("Consistent with our Court of Appeals' decision in *Oyerinde*, we find the identical appellate waiver provision in Mr. Ball's plea agreement bars his petition.").

These two decisions aptly noted that the Third Circuit in *Oyerinde* analyzed the precise waiver language present in this case. *See Clark*, 2021 WL 3737195, at *3 (explaining that *Oyerinde* had identical appellate waiver); *Ball*, 2021 WL 51461, at *2 (same). In *Oyerinde*, the Third Circuit concluded that this waiver, which was raised for the first time on appeal, barred the motion for early termination of supervised release. *See* 784 F. App'x at 113–14 ("At its core, Defendant's motion for early termination of supervised release challenged his original sentence by seeking to shorten the term of his supervised release. . . . We will therefore grant the Government's motion to enforce the appellate waiver because Defendant's challenge to his supervised release term falls within the scope of the appellate waiver." (footnotes omitted)).

Despite the potential applicability of *Oyerinde* and the two aforementioned decisions' persuasive discussions about why *Oyerinde* should apply to the waiver here, this court finds that *Oyerinde* is distinguishable. The court in *Oyerinde* concluded that the waiver applied because it clearly prohibited the defendant from appealing an issue relating to his sentence. *See id.*; *see also Mabry*, 528 F. Supp. 3d at 354 n.1 (distinguishing *Oyerinde* because it "was premised on the basis that the action was an appeal, not a collateral attack"). While the Third Circuit seemingly implied that the government could have effectively invoked the waiver before the district court, instead of invoking it for the first time on appeal, the court never had to decide whether the motion would have qualified as a "collateral attack" on the

10

bar Mabry's motion for early termination of supervised release."). It is surely not an appeal from his sentence as this court is the same court which imposed the sentence in this case. It is also not a collateral attack on his sentence. *See id.* at 354–55; *see also United States v. Chavez-Salais*, 337 F.3d 1170, 1172 (10th Cir. 2003) (explaining that collateral attacks "complain about the substance of, or proceedings that determined, a defendant's original sentence or conviction. It is by no means obvious that a defendant's motion to modify his sentence . . . would be reasonably understood as a 'collateral attack' on his sentence as opposed to a motion prospectively to modify a sentence based on events occurring after the original sentence was imposed"); *Crew*s, 2020 WL 6581430, at *2 (determining that waiver in plea agreement did not bar motion for early termination of supervised release, and explaining that, *inter alia* (1) "[w]hile Crews waived the right to appeal and collaterally attack his sentence in his Guilty Plea Agreement, he did not waive the right to file any other sort of motion with respect to his sentence" and (2) "[t]he instant motion does not constitute an appeal of Crews's sentence, request reconsideration of his sentence, or ask us to reverse or vacate any part of his sentence"); *cf. Wall v. Kholi*, 562 U.S. 545, 552 (2011) ("A 'collateral attack' is '[a]n attack on a judgment in a proceeding *other than a direct appeal*.'" (quoting Black's Law Dictionary 298 (9th ed. 2009)); Black's Law Dictionary (11th ed. 2019) (defining "collateral attack" as "[a]n attack on a judgment in a proceeding other than a direct appeal; esp., an attempt to undermine a judgment through a judicial proceeding in which the ground of the proceeding (or a defense in the proceeding) is that the judgment is ineffective. Typically a collateral attack is made against a point of procedure or another matter not necessarily

---

sentence if it was raised with the district court. *See Oyerinde*, 784 F. App'x at 113 n.12 ("The Government's decision not to invoke the waiver before the District Court could be explained by a view that the Government decided that the best way to proceed before the District Court was to address the merits."). As such, the court does not find that *Oyerinde* mandates that the court conclude that Fluellen's waiver bars his motion for early termination of supervised release.

apparent in the record, as opposed to a direct attack on the merits exclusively. A petition for a writ of habeas corpus is one type of collateral attack"). Therefore, the waiver in Fluellen's plea agreement does not bar the motion seeking early termination of supervised release.[4]

---

[4] Even if the court were to find that the instant motion fell within the scope of the waiver provision, the court would still decline to enforce the waiver because any waiver of Fluellen's ability to file a motion for early termination of supervised release was not knowing and voluntary. In general, if the court were to determine that the motion fell within the scope of the waiver, the court must also analyze

> (1) whether the waiver "of the right to appeal her sentence was knowing and voluntary;" (2) "whether one of the specific exceptions set forth in the agreement prevents the enforcement of the waiver;" i.e., what is the scope of the waiver and does it bar appellate review of the issue pressed by the defendant; and (3) "whether enforcing the waiver would work a miscarriage of justice."

*United States v. Goodson*, 544 F.3d 529, 536 (3d Cir. 2008) (quoting *United States v. Jackson*, 523 F.3d 234, 243–44 (3d Cir. 2008)).

Although Fluellen never specifically addressed whether he knowingly and voluntarily entered into the waiver in his submissions, the record demonstrates that he did not knowingly and voluntarily waive his right to file the instant motion. During the guilty plea hearing, Fluellen acknowledged entering into a plea agreement with the government. *See* Gov't's Opp'n at Ex. B, Tr. of Change of Plea Hr'g at 5–6, Doc. No. 247-2. Counsel for the government later indicated that the agreement included Fluellen "agreeing to waive his right to appeal and file collateral proceedings." *Id.* at 8. Judge Davis confirmed with Fluellen that he read and understood the written plea agreement. *See id.* at 9. Fluellen also acknowledged that he had the opportunity to fully discuss the agreement with his counsel. *See id.*

Later during the hearing, Judge Davis engaged in the following colloquy with Fluellen regarding the appellate waiver:

> THE COURT: And under the terms of this plea agreement you're giving up most of your rights to appeal. According to the plea agreement, you can appeal only under three circumstances. First of all, if the Government chose to appeal, you would then have a right to appeal, but for that to occur the Government would have to appeal first. Do you understand that?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: You could also appeal if I gave you an illegal sentence, if I gave you a sentence in excess of the statutory maximums. Do you understand that?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And you could also appeal if I gave you a sentence in excess of the -- improperly gave you a sentence in excess of the recommended Sentencing Guidelines ranges. Do you understand that?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: The fact is, I don't intend to give you an illegal sentence. All right? So what that means is that if you enter the plea and I accept it, it's pretty likely that there won't be any rich [sic] right to appeal. The case will end here in this courtroom in the presence of all of us. Do you understand that?
>
> THE DEFENDANT: Yes, sir.

### D. The Merits of the Motion

Since the waiver does not bar Fluellen's request for early termination of supervised release, the court now addresses the merits of the motion. As indicated above, the court must consider the relevant section 3553(a) factors in addressing the instant motion. *See* 18 U.S.C. § 3582(e)(1). Those relevant factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> . . .
>
>   (B) to afford adequate deterrence to criminal conduct;
>
>   (C) to protect the public from further crimes of the defendant; and
>
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;

---

THE COURT: Okay. So the things that I've explained to you are the rights that you give up or surrender when you enter a plea. Do you understand that this is what we've been talking about?

THE DEFENDANT: Yes, sir.

THE COURT: And do you understand the rights as I have explained them to you?

THE DEFENDANT: Yes, sir.

THE COURT: Are you willing to give up these rights, pretrial rights, trial rights and post-conviction rights, are you willing to give up these rights and enter this plea?

THE DEFENDANT: Yes, sir.

*Id.* at 17–18. Judge Davis later accepted the plea and found that "it was entered [into] knowingly, intelligently and voluntarily." *Id.* at 26.
    Unfortunately, based on this record, the court cannot find that Fluellen knowingly and voluntarily entered into a waiver of his right to seek early termination of supervised release under 18 U.S.C. § 3583(e). While Fluellen acknowledged reading the plea agreement and discussing it with his attorney, there was no substantive discussion during the hearing about his waiver of his right to collaterally attack his sentence. Also, as it is, at best, unclear whether a motion for early termination of supervised release is a "collateral attack" on a sentence, he was not "put on notice that he was surrendering his right to file a motion under 18 U.S.C. § 3583(e)." *Mabry*, 528 F. Supp. 3d at 356. The record also does not reflect that Fluellen's "lawyer advised him of such consequences." *See id.* Therefore, the court cannot conclude that Fluellen knowingly and voluntarily waived his right to file the instant motion.

13

 (4) the kinds of sentence and the sentencing range established for—
  (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

   (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

   (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

  (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

 (5) any pertinent policy statement—

  (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

  (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

 (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

 (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)–(7) (internal footnote omitted).[5] "District courts are not required to make specific findings of fact with respect to each of these factors; rather, 'a statement that [the district

---

[5] The court has omitted section 3582(e)(2)(A), which requires that a sentence "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[,]" because "the only [traditional sentencing] factor not relevant to a court's decision of whether to impose supervised release ... is 'the need for the

court] has considered the statutory factors is sufficient." *Melvin*, 978 F.3d at 52–53 (alteration in original) (quoting *United States v. Gammarano*, 321 F.3d 311, 315–16 (2d Cir. 2003)).

"[A] district court need not find that an exceptional, extraordinary, new, or unforeseen circumstance warrants early termination of supervised release before granting a motion under 18 U.S.C. § 3583(e)(1)." *Id.* at 53. Thus, while "extraordinary circumstances may be *sufficient* to justify early termination of a term of supervised release, . . . they are not *necessary* for such termination." *Id.* (citing *Murray*, 692 F.3d at 279). Moreover,

> "[g]*enerally*, early termination of supervised release under § 3583(e)(1)" will be proper "only when the sentencing judge is satisfied that new or unforeseen circumstances" warrant it. [*United States v. Davies*, 746 F. App'x 86, 89 (3d Cir. 2018)] (emphasis added) (internal quotation marks omitted). That is because, if a sentence was "sufficient, but not greater than necessary" when first pronounced, 18 U.S.C. § 3553(a), we would expect that something will have changed in the interim that would justify an early end to a term of supervised release. But we disavow any suggestion that new or unforeseen circumstances must be shown.

*Id.* (first alteration in original).

In this case, although the undersigned was not the sentencing judge, the court will analyze each of the relevant section 3553(a) factors in turn and then determine whether early termination is warranted and is in the interest of justice.

### 1.     Analysis of Section 3553(a) Factors

a.     <u>The Nature and Circumstances of the Offense and the History and Characteristics of the Movant</u>

Fluellen was involved with four other individuals in a conspiracy to distribute a significant amount of methamphetamine from October 2007 through February 2009. He pleaded guilty to distributing and conspiring to distribute at least five kilograms, but no more than 15 kilograms, of

---

sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.'" *United States v. Murray*, 692 F.3d 273, 280 (3d Cir. 2012) (citation omitted).

15

methamphetamine. Judge Davis imposed a lengthy term of imprisonment and a mandatory five-year term of supervised release.

As for Fluellen's history, he was adjudged delinquent for committing robbery and burglary offenses as a juvenile, and he was convicted for carrying a concealed weapon and cocaine distribution as a young adult. The presentence report indicates that he had a difficult childhood, having a father who suffered from substance abuse as well as eventually moving to California with his mother and living in a gang-infested area. Leading up to his convictions and sentence in this case, Fluellen certainly was on a dangerous path and was not a law-abiding citizen.

Despite the above, the record concerning Fluellen's activities after his release from incarceration and certainly while on supervised release are highly commendable. As noted by Probation Officer Smith during the evidentiary hearing, Fluellen has complied with all standard conditions of his supervised release, he has completed a 20-week cognitive-behavioral program, has complied with and had no issues with drug testing (despite his job requiring him to work overnight), he has maintained employment, and he has satisfied all his financial requirements insofar as he paid his special assessment and restitution. He is also involved with two e-commerce businesses with his fiancée, and he has three children, with twins on the way. Probation Officer Smith also supports Fluellen's request for early termination of supervised release, and she believes that he is at a low risk to reoffend due to the changes he has made in his life and his high level of compliance while being supervised.

The record reflects that Fluellen has engaged in substantial rehabilitative efforts and has a supportive family. Fluellen's efforts are very commendable, and the court encourages him to continue on this path. It is also highly positive that Probation Officer Smith is so supportive of Fluellen's request for early termination of supervised release.

At bottom, Fluellen has led a law-abiding life since he was released from federal incarceration. This includes his time at a halfway house and his time while under supervised release. While the court greatly appreciates Probation Officer Smith's recognition of these efforts and her recommendation that the court terminate supervised release, the court finds that the serious nature of Fluellen's crimes weighs against granting relief.

b. <u>The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant, and Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner</u>

As the government notes in its submission, a significant concession from the government as part of the plea agreement was that it agreed not to file an information under 21 U.S.C. § 851, which would have doubled the mandatory minimum sentence of imprisonment from ten years to 20 years. *See* Gov't's Opp'n at 2. In addition, the presentence report reflected a sentencing guideline range of 210 to 262 months, and Fluellen received a sentence below that guideline range. Moreover, Fluellen received the benefit of the 782 Amendment to the Sentencing Guidelines to have his sentence reduced from 180 months to 168 months. *See* Doc. No. 234. Ultimately, Fluellen received a lengthy term of imprisonment (even with the reduction in his sentence), and a mandatory period of five years of supervised release. While the court fully understands Probation Officer Smith's determination that Fluellen is currently at a low risk to reoffend, this period of supervised release continues to deter any criminal conduct and protects the public from any further crimes. Thus, this factor does not support early termination of Fluellen's supervision.

c.     The Sentencing Range Established by the Sentencing Commission

The court does not find that this factor supports early termination of supervised release, especially considering Fluellen received a mandatory five-year term of supervised release as part of his sentence.[6]

d.     Any Pertinent Policy Statement Issued by the Sentencing Commission

This factor does not appear to support early termination of supervised release, as no party referenced any relevant policy statements.

e.     The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

There is no evidence that the court should terminate Fluellen's term of supervised release to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.[7]

f.     The Need to Provide Restitution to Any Victims of the Offense

This factor is inapplicable, although the court acknowledges that Probation Officer Smith indicated that Fluellen has fully paid his financial obligations imposed as part of his sentence.

---

[6] As far as the court can discern, the issue of whether a district court can reduce a mandatory term of supervised release is undecided in this circuit. *See United States v. Powell-Ryder*, No. 20-2617, 2021 WL 2838375, at *2 n.15 (3d Cir. July 8, 2021) ("For purposes of this analysis, we assume without deciding that a statutory mandatory minimum term of supervised release is eligible for early termination."); *Damon*, 933 F.3d at 275 (3d Cir. 2019) ("The Government also raises an important point: it is unclear that any reduction of supervised release would be appropriate because 18 U.S.C. § 841(b)(1)(A) imposes a mandatory minimum term of supervision. But we do not reach this issue." (citing *United States v. Gwinnett*, 483 F.3d 200, 206 (3d Cir. 2007))). The court located only one appellate decision, from outside this circuit, which directly addressed this issue. *See United States v. Spinelle*, 41 F.3d 1056, 1060–61 (6th Cir. 1994) ("We find that even though the district court had to sentence Spinelle to a three-year term of supervised release, it still had the subsequent discretionary authority to terminate the term and discharge Spinelle after one year of completion."). There are also two appellate decisions where the circuit courts assumed that the district court could terminate a mandatory term of supervised release. *See United States v. Bundy*, 391 F. App'x 886, 886–87 (D.C. Cir. 2010) ("Even assuming his mandatory term of supervised release could be reduced, Bundy's argument faces two problems."); *United States v. Vargas*, 564 F.3d 618, 622 n.3 (2d Cir. 2009) ("Assuming mandatory supervised release may be terminated after a defendant serves at least one year . . . .").

[7] During the hearing, Fluellen indicated that his brother, Che Fluellen, and another of his co-defendants, were granted early termination of supervised release. The court has no evidence as to what occurred during those proceedings or what the respective courts' considerations were when granting early termination.

2. **Whether Early Termination of Supervised Release is Warranted by Fluellen's Conduct and the Interest of Justice**

The court recognizes that

> the primary purpose of supervised release is to facilitate the integration of offenders back into the community rather than to punish them." [*United States v. Albertson*, 645 F.3d 191, 197 (3d Cir. 2011)] (internal quotation marks omitted). "Congress intended supervised release to assist individuals in their transition to community life." *United States v. Johnson*, 529 U.S. 53, 59, 120 S.Ct. 1114, 146 L.Ed.2d 39 (2000). Thus, "supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *Id.* Importantly, "[s]upervised release ... is not punishment in lieu of incarceration," *United States v. Granderson*, 511 U.S. 39, 50, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994), but rather is primarily concerned with "facilitat[ing] the reintegration of the defendant into the community." *United States v. Vallejo*, 69 F.3d 992, 994 (9th Cir. 1995).

*Murray*, 692 F.3d at 280 (second and third alterations in original).

As indicated above, Probation Officer Smith confirmed that Fluellen has complied with all conditions of his supervised release and has been an exemplary supervisee. The court notes that Fluellen is required to comply with the terms of supervised release. *See United States v. Guilliatt*, No. Crim. A. 01-408, 2005 WL 589354, at * (E.D. Pa. Jan. 18, 2005) ("The conduct cited by defendant in support of his Petition is commendable. However, it is nothing more than what is required under the terms of defendant's probation."); *see also United States v. Taylor*, 729 F. App'x 474, 475 (7th Cir. 2018) ("Taylor also argues the district court abused its discretion in denying his motion because he adhered to the conditions of his supervised release. But mere compliance with the terms of supervised release is expected, and without more, insufficient to justify early termination under 18 U.S.C. § 3583(e)."); *United States v. Moon*, Crim. No. 19-143, 2021 WL 3738910, at *4 (W.D. Pa. Aug. 24, 2021) ("Compliance with the conditions of supervision, including refraining from engaging in criminal conduct, is required behavior while serving a term of supervised release." (citation omitted)). Also, "[t]he fact of compliance may very well mean that supervision is serving its deterrent and rehabilitative purposes and continuation of it to full

19

term will achieve its desired effects on the supervised individual and community." *United States v. Berger*, Crim. No. 09-308, 2021 WL 2354517, at *5 (W.D. Pa. June 9, 2021).

At bottom, Fluellen's conduct, which includes his stable and supportive family, his consistent employment, his compliance with all conditions of supervised release, his desire to increase his business opportunities through obtaining a CDL Class A license and starting a trucking business, as well as his desire to continue to progress in his relationship with his son, who lives in Philadelphia, are commendable. The court also understands Fluellen's concerns about his son's living arrangements and his desire to provide a safer environment for him. Nonetheless, especially considering the mandatory nature of the term of supervised release and the fact that Fluellen is seeking to terminate supervised release at a fairly early stage of that supervised release, the court does not find that his conduct warrants termination at this time. The court also finds that the interest of justice is best served by Fluellen completing his term of supervised release.

### III.    CONCLUSION

For the reasons discussed above, the court does not find that the waiver provision in Fluellen's plea agreement bars the instant motion seeking early termination of supervised release. The court nonetheless finds that Fluellen has failed to meet his burden that early termination of supervised release is warranted at this time. Accordingly, the court will deny the motion.

The court will enter a separate order.

BY THE COURT:

/s/ *Edward G. Smith*
EDWARD G. SMITH, J.